UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

                                                 :

KENDALL JONES,                        :

                      Plaintiff,    :

                                                 :

                  -v-                   :

                                               :

COMMISSIONER OF SOCIAL SECURITY, :

                      Defendant. :

                                               :

------------------------------------------------------ X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: October 26, 2016

14-cv-7856

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

     Plaintiff Kendall Jones seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner"), finding that he was not disabled and not entitled to Social Security Disability ("SSD") benefits under Title II or Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). Plaintiff claims that he is entitled to disability benefits based on his diabetes, sleep apnea, hypertension, pain in his back, shoulder and leg, and major depression with psychotic features.

     This matter is before the district court for the second time. On May 9, 2012, the Commissioner found that plaintiff was disabled as of October 1, 2011. Tr. 1-4. Plaintiff appealed, and the court remanded the case for further proceedings concerning the period of January 6, 2011, through September 30, 2011.[1] Tr. 632-63.

---

[1] After this time period, plaintiff's age category for the purpose of determining whether he was disabled changed to an individual of advanced age. Tr. 15; <u>see</u> 20 C.F.R. § 404.1562, 416.967.

Upon remand, a supplemental hearing was held before an administrative law judge ("ALJ").  Tr. 576-620.  On May 28, 2014, the ALJ issued a decision finding that plaintiff was not disabled during the period of January 6, 2011, through September 30, 2011.  Tr. 553-68.  The ALJ's decision became the final decision of the Commission on July 28, 2014.  Tr. 541-52.  Plaintiff brings this action seeking reversal of that decision.

Now before the Court are the parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, defendant's motion is GRANTED, and plaintiff's motion is DENIED.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Factual Background

The Court recites only those facts relevant to its review here.  A more thorough summary of plaintiff's medical history can be found in the parties' briefing and in the extensive administrative record.

#### 1.    Plaintiff's Personal History

Plaintiff was born in March 1957.  Tr. 29, 151.  He attended school through the tenth grade.  Tr. 29, 193.  Plaintiff did not obtain a general equivalency diploma but took some college courses.  Tr. 29-30.  From 1991 through 2007, plaintiff worked as a school aide, performing clerical duties as well as child monitoring.  Tr. 33-34, 193, 200.  In 2007 and 2008, plaintiff worked in a factory, Tr. 193, 200, and in 2009, plaintiff worked as a driver, Tr. 193, 200.  In 2010, plaintiff was self-employed as a babysitter.  Tr. 193, 200.  Plaintiff stated that he stopped working in 2010 due to his medical conditions.  Tr. 192.  Plaintiff alleged that he was disabled due to diabetes,

sleep apnea, hypertension, pain in his back, shoulder and leg, and major depression with psychotic features.  Tr. 192, 197.  Plaintiff alleged an onset date of January 6, 2011.  Tr. 151-54.

Plaintiff has a long standing relationship with his girlfriend; she cooks for him and his son.  Tr. 41.  Plaintiff can bathe, but his girlfriend helps him dress.  Tr. 42.  Plaintiff denied engaging in any significant activities and stated that he prefers to stay at home.  Id.  Plaintiff uses public transportation, but usually has someone with him.  Tr. 30.

### 2.   Plaintiff's Medical History Prior to January 6, 2011

Prior to January 6, 2011, plaintiff received medical care at the Doctor's Medical Group for diabetes and complaints of pain in his left shoulder, lower back, right knee, and left hip.  Tr. 215-302, 420.  A July 2010 magnetic imaging scan ("MRI") of plaintiff's left shoulder revealed an apparent intrasubstance tear to the suprspinatous muscle and an anterior glenoid labrum tear.  Tr. 223, 418, 469.  On August 12, 2010, Physician's Assistant ("PA") Amos Alabi certified that plaintiff had a history of chronic leg pain, for which he was taking pain medication, and that he was not able to lift any heavy objects.  Tr. 420.

Plaintiff was also evaluated on August 25 and September 1, 2010.  Tr. 243-48, 280-86, 327-49, 428-446.  Based upon a physical examination, physician Dr. Padmavathi Jagarlamudi assessed that plaintiff should be restricted to walking, climbing, and reaching from one to three hours, and lifting twenty pounds one to ten times an hour.  Tr. 242-43.  As part of the evaluation, plaintiff was referred for a psychiatric examination.  Tr. 243.  On September 1, 2010, plaintiff was diagnosed

with bipolar mood disorder.  Id.  On September 17, 2010, plaintiff was placed on a ninety-day wellness plan.  Tr. 244.

On December 6, 2010, psychiatrist Dr. Herb Meadow performed a consultative psychiatric evaluation of plaintiff at the request of SSA.  Tr. 231-34. Dr. Meadow reported that the results of the examination appeared consistent with psychiatric problems that were not in and of themselves significant enough to interfere with plaintiff's abilities to function on a daily basis.  Tr. 233.  Dr. Meadow opined that plaintiff would be able to perform all tasks necessary for vocational functioning.  Id.

On December 6, 2010, Dr. Sharon Revan conducted a consultative internal medicine examination of plaintiff at the request of SSA.  Tr. 235-39.  Dr. Revan diagnosed plaintiff with diabetes, hypertension, left neck pain, and left leg and knee pain.  Tr. 238.  She opined that plaintiff had mild limitations of his upper extremities for gross motor activity secondary to pain; mild limitations climbing stairs due to shortness of breath; limitations of walking due to knee pain; mild limitations of lying down due to neck and shoulder pain; no limitations of personal grooming; and mild limitations of activities of daily living secondary to his shoulder pain.  Tr. 238.

       3.   Plaintiff's Medical History from January 6 through September 30, 2011

       a.   Plaintiff's physical impairments

On January 19, 2011, plaintiff saw PA Alabi at the Doctor's Medical Group for a follow-up concerning his left shoulder.  Tr. 252-53, 313, 451.  PA Alabi

4

completed forms indicating that plaintiff had back, shoulder, and leg pain.  Tr. 252.
Surgery for a torn ligament in plaintiff's left shoulder was pending.  Id.  Plaintiff
took pain medication and engaged in physical therapy in order to manage the pain
in his back.  Id.  PA Alabi considered plaintiff temporarily unemployable.  Tr. 253.

On March 18, 2011, PA Alabi saw plaintiff to review his medications.  Tr.
313, 451.  Upon a Review of Systems,[2] PA Alabi reported that plaintiff was able to
conduct his usual activities, and that plaintiff denied joint pain or muscle weakness,
anxiety, or depression.  Tr. 313.  On March 30, 2011, PA Alabi saw plaintiff for a
follow-up.  Tr. 313-14, 452.  PA Alabi did not report any examination findings but
assessed diabetes with neurological manifestations.  Tr. 314.  On April 27, 2011, PA
Alabi assessed controlled hypertension and diabetes.  Tr. 314, 452.  PA Alabi noted
that plaintiff was alert and was not in acute distress.  Id.

On June 1, 2011, PA Alabi saw plaintiff for renewal of plaintiff's diabetes
prescriptions.  Id.  She noted that plaintiff's extremities were normal.  Id.  On June
15 and 17, 2011, plaintiff denied any acute medical problems, other than diabetes.
Tr. 315, 317, 452, 455.  Upon examination, plaintiff's extremities were noted as
normal.  Id.  On June 22, 2011, cardiologist Dr. Salman Haq examined plaintiff and
cleared plaintiff for shoulder surgery from a cardiac standpoint.  Tr. 315-17, 453-55.
Plaintiff had been scheduled to undergo arthroscopy of the left shoulder, but the
procedure was cancelled due to complaints of chest pain.  Tr. 316.  Upon a Review of

---

[2] Review of Systems in a health history is a system-by-system review of the body function.  See
http://medical-dictionary.thefreedictionary.com/review+of+systems (last visited Oct. 18, 2016) (citing
MOSBY'S MEDICAL DICTIONARY (8th ed. 2009)).

Systems, Dr. Haq reported that plaintiff was able to perform his usual activities. Id. Dr. Haq's examination indicated that plaintiff's spine and joints were normal; that plaintiff's motor power was five out of five; and that plaintiff had a normal posture, movement, and muscle tone. Tr. 317.

On June 27, 2011, plaintiff went to the doctor's office to request that SSA forms be completed. Tr. 317-18, 455-56. PA Alabi noted that plaintiff had a history of psychiatric problems, diabetes, and back pain. Id. According to PA Alabi's notes, plaintiff was not feeling better. Id. PA Alabi reported that plaintiff's blood pressure was 150/96; plaintiff's neck was supple with full range of motion; and plaintiff's chest was clear and his abdomen was benign. Tr. 318. Examination of plaintiff's extremities revealed knee pain and that plaintiff had "some excruciating" pain from the back physical. Id. PA Alabi assessed joint pain, diabetes, high blood pressure, and a psychiatric problem. Id.

The following month on July 26, 2011, plaintiff received a prescription for an insulin pump because his blood sugar was not controlled on oral medication. Tr. 457. PA Alabi's notes indicate that plaintiff's blood pressure was 140/90; plaintiff's neck was supple with full range of motion; and plaintiff's extremities were normal. Id. Several days later, on July 29, 2011, when seen for a productive cough, a physical examination indicated that plaintiff's extremities were normal. Tr. 318. When plaintiff returned for renewal of his insulin prescription on August 24, 2011, his neck was reported as supple and his extremities normal. Tr. 457.

6

On August 17, 2011, Dr. Barbara Akresh conducted a consultative internal medicine examination of plaintiff at the request of SSA.  Tr. 379-83.  Upon physical examination, she noted that plaintiff did not appear to be in acute distress; he wore a large plastic back-brace, which he refused to remove for examination; his gait and station were normal, but he was unable to walk on his heels or toes; he could squat one-quarter of the way; he declined to change for the examination; he declined to get on and off the examination table, claiming that he would fall; and he was able to rise from a chair without difficulty.  Tr. 381.

Dr. Barbara Akresh further noted that plaintiff's blood pressure was 130/90; his heart had regular rhythm with no murmur, gallop, or rub; he had full ranges of motion of his cervical spine but had diminished range of motion in his lumbar spine; Dr. Akresh could not state whether this diminished range of motion was due to the brace or an intrinsic problem.  Tr. 381.  Dr. Akresh noted that due to the back-brace that plaintiff refused to remove, his thoracic spine could not be evaluated.  Id. Dr. Akresh also noted that straight leg raise was negative; plaintiff had full ranges of motion of the right shoulder, elbows, forearms, and wrists; plaintiff had diminished range of motion of the left shoulder, complaining of pain in the trapezius; plaintiff had full ranges of motion of the hips, knees, and ankles; plaintiff's joints were stable and nontender and there was no redness, heat, swelling, or effusion; upon neurologic evaluation, plaintiff's reflexes were physiologic and equal, there was no sensory deficit noted, and strength was five out of five in the upper and lower

extremities;  there was no muscle atrophy evident; plaintiff's hand and finger dexterity were intact; and plaintiff's grip strength was five out of five.  Id.

On August 17, 2011, Dr. Akresh diagnosed plaintiff with insulin dependent diabetes, hypertension, and a history of depression, sleep apnea, chronic low back pain, cervical spine disc disease with pain, and decreased motion of the left shoulder.  Tr. 383.  Dr. Akresh noted that plaintiff reported a history of heart murmur, but further noted that there was no diagnosis of such a heart murmur.  Id. She opined that plaintiff had moderate limitations of his ability to perform strenuous activities secondary to insulin dependent diabetes, hypertension, and a history of a heart murmur and opined that plaintiff had moderate limitations of his ability to lift and carry heavy objects secondary to chronic low back pain and a history of cervical spine disease.  Id.

On September 16, 2011, Dr. Jordan Linda declined to clear plaintiff for arthroscopic surgery.  Tr. 457.  Dr. Linda noted that plaintiff's diabetes was uncontrolled and that he required clearance from cardiology.  Id.  Dr. Linda's notes indicate that plaintiff exhibited no gross neurological deficits.  Id.

During a September 28, 2011 office visit for a cold, plaintiff reported that he was able to conduct his usual activities, and he denied joint pain or muscle weakness.  Tr. 457-58.   A neurological examination performed at this visit revealed intact sensation and normal muscle tone and strength.  Tr. 459.  Plaintiff's cognitive functioning was reported as normal.  Id.

b.    Plaintiff's psychiatric impairments

On February 1, 2011, psychiatrist Dr. Francisco Rodriguez evaluated plaintiff at the Communilife, Inc., Vidal Guidance Center ("Communilife").  Tr. 255-61, 493-99; see Tr. 501-05, 507-12; see also Tr. 262-73, 481-92 (psychosocial assessment questionnaire responses).  Dr. Rodriguez noted that plaintiff reported depression in the context of job loss related to accusations that he made inappropriate remarks, but that plaintiff stated the accusations were untrue and that he had been harassed to leave the job.  Tr. 255.  Dr. Rodriguez noted that plaintiff had several other stressors in his life related to the death of his siblings and caring for his teenage son who had attention deficit hyperactivity disorder.  Id.

Upon mental status evaluation, Dr. Rodriguez noted that plaintiff appeared casually dressed and groomed; his psychomotor activity was within normal limits; he had a cooperative attitude; he was depressed and angry, and his affect was full range and appropriate to his thought content; plaintiff's speech was clear, coherent, and goal-directed; plaintiff displayed no abnormalities of thought process or thought content; plaintiff reported that he was fearful of going outside; he reported that sometimes he heard voices talking about death; plaintiff was oriented times three (he had orientation of time, place, and person), and he had poor ability to concentrate; plaintiff reported poor remote and recent recall; plaintiff's cognitive functioning appeared to be average; his ability to do calculations was limited, and he had fair abilities to abstract; and plaintiff's impulse control appeared from poor to fair and his judgment appeared fair.  Tr. 257-58.  Dr. Rodriguez assessed plaintiff with major depressive disorder, recurrent with severe psychotic features on Axis I;

deferred diagnosis on Axis II; diabetes, dyslipidemia, lower back pain, status post eye and ankle surgery fifteen years earlier on Axis III; problems with support group, occupation, and economic situation on Axis IV; and global assessment of functioning score of 50 on Axis V.[3]  Tr. 260.  Dr. Rodriguez recommended psychotherapy and psychoeducation.  Id.

On February 24, 2011, Dr. Rodriguez completed a treating physician's wellness plan regarding plaintiff.  Tr. 422-23.  Dr. Rodriguez considered plaintiff "temporarily unemployable" for six to nine months.  Tr. 423.  From February through August 11, 2011, plaintiff met with Sade Arzu, a mental health counselor at Communilife for individual counseling sessions.  Tr. 351-56, 358-62, 364-70, 372-76, 378.  According to the treatment notes, plaintiff reported symptoms of depression, insomnia, fatigue, anxiety/worry, as well as anger related to continued thoughts about his loss of employment and issues related to his family, financial difficulties, and diabetes.  Tr. 351-56, 358-62, 365-70, 372-76, 378.

Between February and August 11, 2011, plaintiff also met on occasion with Dr. Rodriguez.  Tr. 357, 363, 371, 377.   Dr. Rodriguez's notes indicate that plaintiff reported depression that had improved, Tr. 357, 363, 371, 377, and that overall

---

[3] These diagnoses reflect use of the multi-axial system of assessment, where each Axis refers to a different domain of information that may help the clinician to plan treatment and predict outcome. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM") 27 (4th ed. 2000).  Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment of functioning ("GAF").  Id.  GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning.  Id. at 32, 34.  A GAF of 41 to 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  Id.

during these visits, plaintiff was calm and cooperative, Tr. 357, 363, 371, 377.  Dr. Rodriguez noted that plaintiff was alert and oriented; his affect was appropriate; and that he did not display signs of psychosis.  Tr. 351, 357, 363, 371, 377.

On April 21, 2011, Dr. Rodriguez noted that plaintiff reported that he felt a little better and that medication had improved his sleep.  Tr. 363.  Dr. Rodriguez noted that during this evaluation, plaintiff was upset, tense, and paranoid because he felt that the front desk attendant had been disrespectful and motivated by discrimination in not moving up his appointment and sending a Hispanic woman to see the doctor before him.  Tr. 363.  However, Dr. Rodriguez noted that during the mental status examination, plaintiff calmed down and he left the office in a better mood.  Tr. 363.  On June 3, 2011, Dr. Rodriguez noted that plaintiff appeared concerned and preoccupied by his medical problems, Tr. 371, and on August 2, 2011, noted that plaintiff had a constricted affect, Tr. 377.  On May 19, 2011, Dr. Rodriguez completed a second treating physician's wellness plan report and opined that plaintiff was unable to work for at least twelve months.  Tr. 425-26.

On August 17, 2011, Dr. Herb Meadow conducted a second consultative psychiatric examination of plaintiff at the request of SSA.  Tr. 384-87.  Dr. Meadow noted that plaintiff stated that he avoided public transportation due to panic attacks; plaintiff was receiving psychiatric treatment; plaintiff reported that he had difficulty falling asleep and had lost forty pounds in the past year; plaintiff reported symptoms of depression and flashbacks of past sex abuse as a teenager; plaintiff described panic attacks consisting of palpitations and trembling brought on by

crowded spaces; and plaintiff stated that he experienced intrusive thoughts but denied any history of a thought disorder.  Tr. 384.

At the examination, Dr. Meadow further noted that plaintiff was cooperative and had an adequate manner of relating; plaintiff dressed appropriately and was well-groomed; plaintiff's gait, posture, and motor behavior were normal; plaintiff made appropriate eye contact; he spoke fluently and clearly, and his expressive and receptive language skills were adequate; plaintiff's thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia; plaintiff's affect was appropriate in speech and thought content; plaintiff's mood was depressed; plaintiff's sensorium was clear and he was oriented times three; plaintiff's attention and concentration were intact for counting and calculations; he made one mistake counting serial three's from twenty; plaintiff's recent and remote memory were intact; he was able to repeat three out of three objects immediately and after five minutes; he was able to repeat four numbers forward and three backward; plaintiff's cognitive functioning was average, and his general fund of information was appropriate to experience; and his insight and judgment were fair. Tr. 385.  According to Dr. Meadow's notes, upon mental status examination, plaintiff stated that he took care of his personal hygiene and did light household chores and that he socialized with friends and family and spent his time watching television.  Tr. 386.

Dr. Meadow noted that the results of the August 17, 2011 examination appeared to suggest that plaintiff had psychiatric problems, but were not significant

enough to interfere with plaintiff's ability to function on a daily basis.  Tr. 386.  Dr. Meadow diagnosed plaintiff with depressive disorder not otherwise specified, panic disorder without agoraphobia, and post-traumatic stress disorder ("PTSD") on Axis I; deferred diagnosis on Axis II; and sleep apnea, hypertension, diabetes and back, shoulder and leg pain on Axis III.  Id.  Dr. Meadow opined that Plaintiff would be able to perform all tasks necessary for vocational functioning.  Id.

On September 6, 2011, State psychology expert Dr. Inman-Dundon reviewed plaintiff's record.  Tr. 404.  Dr. Inman noted that the record indicated that plaintiff was still upset about allegedly losing his job because of false accusations and that plaintiff felt slighted and was angry.  Id.  Dr. Inman-Dundon concluded that plaintiff had some limitations in interactions with co-workers and supervisors because he was quick to feel disrespected and felt a racial motivation.  Id.  Dr. Inman concluded that plaintiff could perform simple and semiskilled work in a low contact setting.  Id.

### 4.   Plaintiff's Medical History after September 30, 2011

After September 30, 2011, plaintiff continued to receive medical care at the Doctor's Medical Group.  Tr. 459-62.  On January 26, 2012, PA Alabi completed a medical assessment of plaintiff's ability to perform work-related activities (physical), restricting plaintiff to less than sedentary exertion.  Tr. 531-33.

From August 19, 2013 through October 28, 2013, plaintiff was also seen at Essen Medical Associates for medical care.  Tr. 823-43.  Notes from such care reflect that plaintiff had left shoulder surgery in August 2012.  Tr. 824.

On February 9, 2012, Dr. Luis Gonzales completed a psychiatric questionnaire regarding plaintiff, in which he opined that plaintiff had poor to no abilities in most areas of making occupational adjustments, performance adjustments, and personal-social adjustments.  Tr. 537-38.  Dr. Gonzales reported that plaintiff had been in monthly psychiatric care and weekly psychotherapy since February 2011.  Tr. 535.  According to Dr. Gonzales's notes, plaintiff verbalized feelings of sadness, worthlessness, and hopelessness and plaintiff acknowledged problems with sleep exacerbated by intrusive thoughts.  Id.  Dr. Gonzales reported that plaintiff had major depression disorder, recurrent and severe with psychotic features on Axis I; deferred diagnosis on Axis II; diabetes on Axis III; economic and health problems on Axis IV; and a GAF of 50 on Axis V.  Tr. 536.  Dr. Gonzales further reported that plaintiff exhibited a depressed, angry and anxious mood, and that plaintiff heard voices talking about death.  Tr. 538.

On August 13, 2013, Dr. Sharon Sageman completed a medical report concerning plaintiff's psychiatric impairments.  Tr. 818-22.  She opined that plaintiff had moderate to marked loss of function in all areas of mental functioning; moderate restrictions of activities of daily lifting; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence and pace; and repeated episodes of deterioration or decompensation.  Tr. 820-21.

14

B.     Procedural Background

On June 10, 2011, plaintiff applied for monthly Supplemental Security Income ("SSI"). Tr. 129-50.  On June 13, 2011, he applied for monthly disability insurance benefits, alleging that he had been disabled since January 6, 2011.  Tr. 151-54.  The Social Security Administration ("SSA") initially denied plaintiff's claims.  Tr. 73-74, 77-88.  Plaintiff then requested a hearing before an ALJ, which took place on January 18, 2012 ("First Administrative Hearing").  Tr. 89-94, 23-71. The ALJ issued a decision finding that plaintiff was disabled as of October 1, 2011. Tr. 5-17; see Tr. 664 (disability determination and transmittal reflecting disability onset date of October 1, 2011).  The ALJ's decision became the final decision of the Commission when the Appeals Council denied plaintiff's request for review on May 9, 2012.  Tr. 1-4.

Plaintiff subsequently commenced an action in the district court appealing the Commissioner's decision.  Tr. 625-30.  By order dated July 11, 2013, the district court remanded the case to the Commissioner for further administrative proceedings concerning the period of January 6, 2011 through September 30, 2011. Tr. 632-63.  By order dated August 23, 2013, the Appeals Council remanded the case back to the ALJ for a new hearing and decision.  Tr. 621-24.  Upon remand, a supplemental hearing was held on November 19, 2013 and February 11, 2014 ("Second Administrative Hearing").  Tr. 675-620.  The ALJ issued a decision on May 28, 2014, finding that plaintiff was not disabled during the relevant time period. Tr. 553-68.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council declined to accept jurisdiction upon review of plaintiff's

15

exceptions on July 28, 2014.  Tr. 541-46; <u>see</u> Tr. 547-52.  Plaintiff then filed the

instant action in this Court.

1.   <u>Testimony at the Second Administrative Hearing</u>

Dr. Peter Schoscheim, a board certified orthopedic surgeon, testified at the

Second Administrative Hearing on November 19, 2013.  Tr. 581-83.  Based upon his

review of plaintiff's file, Dr. Schoscheim opined that since January 6, 2011, plaintiff

could lift, carry, and push/pull twenty pounds occasionally and ten pounds

frequently; could stand and/or walk four hours and sit for six hours with normal

breaks during an eight-hour workday; could not climb ladders, ropes, or scaffolds;

could occasionally climb ramps and stairs, balance, kneel, crouch, crawl and stoop;

could occasionally reach in all directions with his right arm; and could frequently

reach in all directions on his left side other than overhead, which plaintiff could do

occasionally.  Tr. 583-84.  Dr. Schoscheim further opined that plaintiff should avoid

hazardous machinery and unprotected heights and did not have any limitations of

gross or fine manipulation.  Tr. 584.

Dr. Goldman, a board certified orthopedic surgeon, testified at the Second

Administrative Hearing on February 11, 2014.  Dr. Goldman testified that the

record contained evidence of a tear in plaintiff's labrum or rotator cuff, but that the

MRI was not definitive.  Tr. 603.  Dr. Goldman believed that the surgical report

concerning plaintiff's left shoulder, which was not in the record, would be helpful to

provide information about the diagnosis of the shoulder impairment and the

severity of the impairment, and would inform whether there was loss of motion or

weakness.  Tr. 605-606.  Dr. Goldman did not believe the shoulder finding would

16

affect the strength in plaintiff's hands, and there was no reason why plaintiff could not hold, grip, and carry twenty to twenty-five pounds frequently.  Tr. 603.

At the Second Administrative Hearing, plaintiff's attorney indicated that he would attempt to obtain the surgical report related to plaintiff's shoulder, and the ALJ indicated that he would forward that report to Dr. Goldman who he would then seek to update his medical opinion.  Tr. 618-19.  Plaintiff was not able to obtain a copy of the report, however.  In addition, the SSA tried, but also was unable to secure the report from plaintiff's surgeon.  Tr. 796; see Tr. 845-50 (copy of medical questionnaire that was sent to Dr. Paul Ackerman).

Dr. Catone, a licensed psychologist, also testified at Second Administrative Hearing on February 11, 2014.  Tr. 609.  Upon review of plaintiff's file, Dr. Catone found evidence that plaintiff had a history of major depressive disorder.  Tr. 613.  Dr. Catone also testified that there was an indication of psychotic features, but that he could not find evidence in plaintiff's record identifying those features or stating how often they occurred.  Tr. 613.  Dr. Catone stated that there was evidence of post-traumatic stress disorder, but that he found no evidence of typical symptoms or the symptoms that plaintiff described in his hearing testimony.  Tr. 613.  Dr. Catone found plaintiff's major depressive disorder to be a severe impairment.  Tr. 614.  In Dr. Catone's opinion, plaintiff's impairments did not meet or equal a listing at that time.  Tr. 614.  Dr. Catone noted that plaintiff's treating source described marked limitations, but that Dr. Catone found no such limitations in the treatment records.  Tr. 614.  Dr. Catone opined that plaintiff had a mild limitation of activities

of daily living and a moderate limitation of socialization and concentration.  Tr. 615.
Dr. Catone did not find episodes of decompensation.  Id.  Dr. Catone noted that
plaintiff derived self-esteem from being in the workforce, and that the loss of his job
was a significant stressor as was dealing with the issues of depression and some
anxiety.  Tr. 616.

2.   Post-Hearing Evidence

Once it was determined that no further evidence was available concerning
plaintiff's shoulder surgery, by letter dated March 14, 2014, the ALJ asked Dr.
Goldman to provide his opinion about plaintiff's ability to perform work-related
activities.  Tr. 865-75.   Dr. Goldman responded by completing the questionnaire
that the ALJ had enclosed.  Tr. 866-71.  Dr. Goldman opined that plaintiff could lift
and carry up to twenty pounds occasionally and up to ten pounds frequently.  Tr.
866.  Dr. Goldman stated that plaintiff could sit, stand, and walk eight hours of an
eight-hour workday.  Tr. 867.  Dr. Goldman opined that due to the left shoulder
surgery, plaintiff could occasionally reach overhead and push/pull with his left
hand; could continuously reach in all directions; could handle, finger, and feel with
his left hand; and had no limitations on his right side.  Tr. 868.  Dr. Goldman stated
that plaintiff could use his feet and could frequently climb stairs and ramps,
balance, stoop, kneel, crouch and crawl, but that plaintiff could not climb ladders or
scaffolds.  Tr. 869.  He opined that plaintiff could not work at unprotected heights
and that plaintiff could occasionally work around moving mechanical parts and
frequently operate a motor vehicle.  Tr. 870.  Dr. Goldman noted that these
limitations were related to plaintiff's left shoulder surgery.  Tr. 873.

II.     APPLICABLE LEGAL PRINCIPLES

A.     Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B.     The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in [Appendix 1].  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

    C.   Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final.  See

Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."

(citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)).  An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

D.     The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess, 537 F.3d at 128.  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i)

22

the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance." 20 C.F.R. § 416.927(d)(3); see also Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133. It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence. See Richardson, 402 U.S. at 399.

E.      The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses

and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez, 77 F.3d at 47)).

## III.   DISCUSSION

Plaintiff advances three arguments in support of his position that ALJ erred in finding that he was not disabled: (1) the ALJ failed to apply the treating physician rule; (2) the ALJ failed to develop the record; and (3) the ALJ failed to meet the Commissioner's burden at step five of the sequential analysis required by 20 C.F.R. §§ 404.1520 and 416.920.[4]  (See Mem. in Supp., ECF No. 15.)  The Court finds no such errors.

### A.   The ALJ's Decision

The ALJ evaluated plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that plaintiff was not disabled within the

---

[4] The Court notes that in his third argument, plaintiff appears to conflate issues relating to steps four and five of the sequential analysis.  In all events, the Court finds that the ALJ did not err in determining plaintiff's residual functional capacity at step four and met the applicable burden at step five of the sequential analysis.

meaning of the Act between January 6, 2011, and October 1, 2011.  The ALJ applied the correct legal standard and his findings are supported by substantial evidence.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity between January 6, 2011, and October 1, 2011.  Tr. 558.  At step two, he determined that plaintiff had severe impairments consisting of diabetes mellitus, a left shoulder ligament tear, and a depressive disorder.  Tr. 558-59.  The ALJ determined at step three that none of plaintiff's impairments, nor any combination of those impairments, was of a severity to meet or medically equal one of the listed impairments in Appendix 1 of the regulations.[5]  Tr. 559-61.

At step four, the ALJ determined that plaintiff had the residual functional capacity to perform "light work" as defined in the regulations, except that he could never climb ladders, ropes, or scaffold, but frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl.  Tr. 561.  The ALJ further determined that plaintiff was limited to occasional overhead reaching and occasional pushing and pulling with the left upper extremity; needed to avoid concentrated exposure to moving machinery and all exposure to unprotected heights; and was capable of working a low stress job (defined as having only occasional decision-making required and occasional changes in work setting), and involving only occasional interactions with the public.  Id.  In making this finding, the ALJ considered plaintiff's symptoms, objective medical evidence and other evidence, as well as opinion evidence.  Based on plaintiff's residual functional

---

[5] Plaintiff does not challenge the ALJ's determinations at steps 1-3.

capacity, the ALJ concluded that plaintiff had been unable to perform any past relevant work.  Tr. 566.  The ALJ's findings at step four are supported by substantial evidence.

The ALJ first described plaintiff's testimony regarding the intensity, persistence, and limiting effects of his alleged symptoms.  Tr. 561.  The ALJ noted that plaintiff testified to numerous ailments including uncontrolled diabetes with numbness in his extremities, uncontrolled blood pressure, sleep apnea with extreme and unpredictable daytime somnolence, a left shoulder tear with constant pain, and pain throughout his body.  Id.  The ALJ further noted that plaintiff also testified to symptoms of depression and anger.  Id.  The ALJ ultimately concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistent and limiting effects of these symptoms are not entirely credible."  Id.   This credibility determination will not be disturbed by this Court.

It is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte, 728 F.2d at 591 (quoting Carroll, 705 F.2d at 642 (internal quotation marks omitted)); see also Gernavage, 882 F. Supp. at 1419 n.6.  The ALJ adequately explained why the evidence in the record cast doubt on plaintiff's credibility and instead supported the ALJ's findings at step four.

Regarding plaintiff's physical impairments, the ALJ explained that the objective medical evidence in the record showed no diabetic complications, such as

retinopathy, neuropathy, or kidney impairment.  Tr. 562.  The ALJ further

explained that at both internist consultative examinations – conducted in December

2010 and August 2011 – plaintiff had no loss of sensation, and plaintiff's treating

physician described his diabetes as "uncomplicated."  Tr. 562.  The ALJ explained

that plaintiff's diabetes would thus contribute to the light exertional libations set

forth in the ALJ's residual functional capacity, but the record did not support a

finding of any additional limitations.  Tr. 561.

     The ALJ further detailed at length the medical evidence related to plaintiff's

left shoulder, and noted that such evidence demonstrated some limited range of

motion, but did not demonstrate more significant neurological deficits and no

redness, heat, swelling or effusion of the joint.  Tr. 562.  The ALJ described the lack

of treatment evidence in record.  Id.  The ALJ noted that while examination notes

indicated that plaintiff demonstrated a reduced range of motion, no sensory, reflex,

or motor strength deficits were noted.  Id.  The ALJ explained that plaintiff's left

shoulder limitations would also similarly contribute to the light exertional

limitations and reaching and manipulative limitations captured in the ALJ's

residual functional capacity assessment, but that the record did not support

additional limitations.

     Regarding plaintiff's psychological impairments, the ALJ reviewed

plaintiff's treatment record.  The ALJ explained that in plaintiff's initial evaluation

with Dr. Rodriguez, Dr. Rodriguez had noted largely normal mental status findings,

including that plaintiff had been casually dressed and well-groomed, had

psychomotor activity within normal limits, a cooperate attitude, and a full range of affect. Tr. 563; see Tr. 257-58. The ALJ further noted that despite diagnosing plaintiff with major depressive disorder with psychotic features, Dr. Rodriguez's notes indicated that plaintiff was calm and cooperative with good eye contact, fully oriented with no signs of psychosis, and that plaintiff reported an overall improvement in his condition.[6]  Tr. 563; see Tr. 351, 357, 363, 371, 377.  In addition, the ALJ detailed the consultative notes from Dr. Meadow, which indicated that plaintiff was cooperative; had fluent and clear speech; had coherent and goal oriented thought process; and had an appropriate affect. Tr. 563; see Tr. 384-87. The ALJ concluded that the record evidence would impose the mental limitations set forth in the residual functional capacity, but that no further limitations were justified.

In addition to explaining that the objective medical evidence discussed above casts doubt upon the credibility of plaintiff's allegations of debilitating pain and disabling mental health symptoms during the period in question, the ALJ also noted multiple inconsistencies in the record that negatively impact plaintiff's credibility.  Tr. 563.  For example, at the first psychiatric consultative evaluation, plaintiff denied any panic attacks, and treatment notes show no allegations of panic attacks.  At the second psychiatric consultative evaluation, however, plaintiff

---

[6] Plaintiff takes issue with the ALJs alleged "inconsistent use of medical evidence." Mem. in Supp. at 6.  Plaintiff appears to suggest that the ALJ ignored Dr. Rodriguez's assessments when they suggested plaintiff was disabled, but credited Dr. Rodriguez's assessments when they demonstrated that plaintiff showed improvement and relatively normal mental status. Id. The ALJ did not ignore evidence, but properly weighed all of the evidence in the record (and Dr. Rodriguez's assessments) and relied upon that which was properly supported.

alleged panic attacks, which is not reflected in the treatment notes from the same period.  Tr. 563; <u>see</u> Tr. 231-34, 384-87.  The ALJ further noted inconsistencies in plaintiff's behavior during various internist examinations and in plaintiff's explanations for the reason that that he stopped working.  The ALJ properly weighed and evaluated these inconsistencies.

Next, the ALJ weighed the physical and psychological opinion evidence in the record.  The ALJ gave great weight to the opinions of Dr. Goldman (medical expert), Dr. Catone (medical expert), Dr. Meadow (psychiatric consultative examiner), and Dr. Inman-Dundon (State psychiatric consultant).  The ALJ also gave some weight to the opinion of Dr. Schoscheim (medical expert).  Plaintiff argues that the ALJ failed to apply the treating physician rule.  Specifically, plaintiff appears to argue that the ALJ failed to apply the treating physician rule by assigning little weight to the opinions of Drs. Rodriguez, Gonzalez, and Sagemen.  <u>See</u> Tr. 565-66; Mem. in Supp. at 1-7.

The Court determines that the ALJ did not err in declining to give controlling weight to Drs. Rodriguez, Gonzalez, and Sagemen, and that the ALJ properly weighed the entirety of the physical and psychological opinion evidence.  The assessments relied upon by the ALJ constitute substantial evidence in support of the ALJ's determination, even when they are contrary to a treating physician's assessment, where – as here – "they are supported by evidence in the record." <u>Schisler v. Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993) (citations omitted); <u>see also</u> <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1039 (2d Cir. 1982) ("The opinion of a treating

physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence.") (citations omitted)).

The ALJ appropriately gave great weight to the post-hearing medical opinion of Dr. Goldman, who submitted a post-hearing interrogatory finding that plaintiff was capable of essentially light work.  Tr. 866-71.  The ALJ noted that Dr. Goldman's opinion was consistent with the absence of a diagnosed impairment or evidence of treatment for plaintiff's back, legs, knees, or feet that would impose any limitations on standing, walking, or sitting.  Tr. 564.  In various instances in the record, plaintiff denied joint paint or muscle weakness.  See, e.g., Tr. 313, 317, 452.  Plaintiff's extremities were frequently reported as normal.  See, e.g., Tr. 314, 318, 452.  The ALJ also found that Dr. Goldman's opinion restricting plaintiff to occasional overhead reaching on the left side was supported by the clinical findings of Dr. Akresh pertaining to plaintiff's left shoulder – which showed some tenderness and reduced range of motion, but no neurological deficits, redness, heat, swelling, or effusion of the joint.  Tr. 564, 381.  In short, the ALJ properly considered the factors required under 20 C.F.R. § 404.1527 and properly accorded Dr. Goldman's opinion great weight.

The ALJ also properly gave great weight to the opinions of Dr. Catone (who testified at the Second Administrative Hearing), Dr. Meadow, and Dr. Inman-Dundon.  Drs. Catone and Inman-Dundon set forth opinions that equated with mild-to-moderate limitations in activities of daily living, social functioning, and

sustaining concentration, persistence, and pace.  Tr. 404.  Dr. Meadow opined that plaintiff would be able to perform all tasks necessary for vocational training, and that plaintiff's psychiatric problems were not significant enough to interfere with his functioning on a daily basis.  Tr. 231-34, 384-87.  The ALJ explained that these findings were consistent with the largely normal mental status findings contained in the record.  Tr. 565.  The record evidence illustrates that plaintiff was cooperative and had an adequate manner of relating; plaintiff dressed appropriately and was well-groomed; plaintiff's gait, posture, and motor behavior were normal; plaintiff made appropriate eye contact; plaintiff spoke fluently and clearly, plaintiff's expressive and receptive language skills were adequate; and plaintiff's thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia.  Tr. 385.

The ALJ appropriately gave some weight to the opinion of medical expert Dr. Schoscheim, who opined that plaintiff would be capable of essentially a narrow range of light work.  The ALJ sufficiently explained that some of Dr. Schoscheim's assessment was consistent with the diagnostic, clinical, and treatment evidence in the record, while there was no basis in the record for other aspects of Dr. Schoscheim's assessment.  Tr. 564; see 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  Specifically, the ALJ appropriately determined

31

that there was no basis in the record for the limitations found by Dr. Schoscheim regarding standing, walking, and sitting that would preclude plaintiff from performing the full range of light work because the record showed no diagnosable problem with plaintiff's back, legs, knees, or feet that could impose such restrictions.  Tr. 564.[7]

The ALJ properly gave little weight to the opinion of treating physician Dr. Rodriguez, who concluded that plaintiff had a global assessment of functioning score of 50; initially found plaintiff temporarily unemployable for 6 to 9 months; and subsequently found plaintiff unable to work for at least 12 months.  Tr. 565-66, 421-26.  The ALJ explained why he assigned Dr. Rodriguez's opinion little weight, noting that it was "inconsistent with the largely normal clinical signs and findings found in Dr. Rodgriguez's treatment notes, along with the largely normal clinical signs and findings found by consultative examiner Dr. Meadow in two separate evaluations."  Tr. 566.  This explanation was sufficient

To start, the determination that a claimant is unable to work is not a medical opinion, but rather an administrative finding that is "reserved to the Commissioner."  20 C.F.R. § 404.1527(d)(3); see also Snell, 177 F.3d at 133.  Second,

---

[7] Dr. Schoscheim testified that plaintiff could stand or walk for four hours.  Tr. 583-84.  In the ALJ's opinion, the ALJ incorrectly asserted that Dr. Schoscheim testified that plaintiff could stand or walk for six hours.  Tr. 564.  As the Commission correctly noted in response to plaintiff's exceptions, the ALJ did not adopt this portion of Dr. Schoscheim testimony, which renders such error immaterial.  See Tr. 542.  Furthermore, as also noted by the Commission, even if the ALJ had adopted the limitation opined by Dr. Schoscheim, the applicable regulations take notice that light work can include a job that involves "sitting most of the time with some pushing and pulling of arm or leg controls."  Tr. 542; see 20 C.F.R. §§ 404.1567, 416.1567.  Therefore, any error by the ALJ in this regards (which the Court finds none), would not change the Court's determination the ALJ's finding is supported by substantial evidence.

a treating source's opinion is only given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); see Halloran, 362 F.3d at 32; Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) ("Generally, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts, for [g]enuine conflicts in the medical evidence are for the Commissioner to resolve.") (citations and quotations omitted) (ellipses in original). Having discussed the relevant findings and contradictory evidence in the record, which the Court has previously detailed, the ALJ adequately explained why Dr. Rodriguez's opinion was given little weight. See 20 C.F.R. § 404.1527(c), 416.927(c)(2).

Similarly, the ALJ properly assigned little weight to the opinions of treating physicians Gonzalez and Sagemen. First, the ALJ noted that both Drs. Gonzalez and Sagemen completed functional assessment forms that essentially concluded that plaintiff was disabled. The Court again notes that a treating source's opinion as to the ultimate conclusion of whether a claiming is disabled "cannot itself be determinative." Snell, 177 F.3d at 133. Here, the ALJ considered the totality of the evidence and made a contrary determination supported by such evidence. See Richardson, 402 U.S. at 399; Mongeur, 722 F.2d at 1039 ("The opinion of a treating physician is not binding if it is contradicted by substantial evidence."). Second, the ALJ adequately addressed the specific opinions of Drs. Gonzalez and Sagemen and

noted that – as with Dr. Rodriguez's opinion – they "were at odds with the clinical signs and findings detailed in the record, specifically with Dr. Meadow's findings of intact concentration and fair insight and judgment." Tr. 566; see Halloran, 362 F.3d at 32; Burgess, 537 F.3d at 128. Furthermore, the ALJ also noted that the record contained no treatment notes from either Dr. Gonzalez or Dr. Sagemen, which made it impossible to know how many times they met with plaintiff. Tr. 566. A treating physician's opinion is only given more weight than a non-treating physician if the physician "has seen [the plaintiff] a number of times and long enough to have obtained a longitudinal picture of [the plaintiff's] impairment." 20 C.F.R. § 404.1527(c)(2)(i); see Mongeur, 722 F.2d at 1039 n.2.

The ALJ also appropriately gave little weight to the opinions of Doctors Sharon Revan and Barbara Akresh (both internist consultative examiners).[8] Dr. Revan found mild limitations in the use of the upper extremities, climbing stairs, walking, lying down, and in activities of daily living. Tr. 564. However, the ALJ noted that such opinion was based partly on plaintiff's uncorroborated allegations, which have no clear diagnosis and are non-medically determinable. Tr. 564-65. Dr. Akresh found moderate limitations in lifting, carrying and strenuous activities, based partially upon plaintiff's alleged "heart murmur," "chronic low back pain," and "cervical spine disease." Tr. 565. However, the ALJ similarly noted that these alleged impairments were not medically determinable. Having examined the evidence in support of Doctor Revan and Akresh's opinions, as well as the

---

[8] Plaintiff does not appear to challenge this aspect of the ALJ's decision.

34

consistency of the opinions with the record as a whole, the ALJ's conclusions to assign such opinions little weight were appropriate.  See 20 C.F.R. § 404.1527(d)(2); Halloran, 362 F.3d at 32 (noting that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts").

Likewise, the ALJ appropriately gave little weight to the opinion of treating physician's assistant Amos Alabi and physician Dr. Padmavathi Jagarlamudi.[9]  PA Alabi stated that plaintiff could stand, walk, or sit for no more than one hour a day and lift no more than 20 pounds, and would have reaching, feeling, handling and pushing/pulling limitations.  Tr. 531.  However, as noted by the ALJ, these assessments are grossly inconsistent with the clinical findings in the record and the lack of any treatment for any orthopedic impairment that cause such extreme limitations.  Tr. 565.  The ALJ further explained that the record does not support the handling and feeling limitations that PA Alabi identified.  Id.  To the contrary, the record revealed that plaintiff had intact hand and finger dexterity and full grip strength.  Tr. 381.  Dr. Jagarlamudi also found plaintiff capable of essentially sedentary work.  Tr. 280-87.  However, as noted by the ALJ, the record shows no diagnosable problem with plaintiff's back, legs, knees, or feet that would impose such a limitation with standing and walking.  Furthermore, the ALJ explained that the total absence of any treatment for any orthopedic impairment also shows that

---

[9] Plaintiff also does not appear to challenge this aspect of the ALJ's decision.

such extreme limitations are not warranted.  Based on the lack of evidence in support of PA Alabi and Doctor Jagarlamudi's opinion, as well as the inconsistency of the opinions with the record as a whole, the ALJ properly assigned such opinions little weight.  See Halloran, 362 F.3d at 32; 20 C.F.R. § 404.1527(d)(2).

In short, the ALJ's findings at step four were supported by substantial evidence in the record.  The ALJ sufficiently discussed plaintiff's testimony and credibility, thoroughly examined the objective medical evidence, and properly weighed the opinion evidence.  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston, 904 F.2d at 126; DeChirico, 134 F.3d at 1182-83.

At the fifth and final step of the sequential analysis, based on his review of the entire record – and in particular, the testimony of a vocational expert – the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have perform," such as Photocopying Machine Operator, Inspector and Hand Packager, and Sealing and Canceling Machine Operator.  Tr. 567.  Plaintiff argues that the ALJ failed to meet the Commissioner's burden in step five of the sequential analysis. [10]  Mem. in Supp. at 9.  Plaintiff's argument is without merit.

---

[10] Plaintiff's argument focuses almost exclusively on the ALJ's determination of plaintiff's residual functional capacity.  Plaintiff thus appears to conflate aspects of steps four and five.  The Court has already explained that the ALJ's finding of plaintiff's residual functional capacity was supported by substantial evidence.  In any event, the Court determines that the ALJ did not err at step four or step five.

As noted, the ALJ enlisted the assistance of a vocational expert to identify what jobs an individual with plaintiff's vocational profile could perform and the incidence of such jobs in the national economy.  Tr. 567, 797-813; see 20 C.F.R. 404.1566(e), 416.966(e).  Vocational expert Jackie Wilson testified about a hypothetical person of plaintiff's same age, education, and work experience who could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; in an eight hour workday could stand and/or walk for six hours with normal breaks; could frequently climb ramps and stairs, balance, stoop, crouch, kneel and crawl, but could never climb ladders, ropes, or scaffolds; could occasionally reach overhead on the left side; had to avoid any exposure to unprotected heights; could only work in a low stress job defined as requiring only occasional decision making and changes in the work setting; and could only have occasional interactions with the public.  Tr. 797-813.  Ms. Wilson opined that such an individual could perform the unskilled light jobs of Photocopying Machine Operator, Inspector and Hand Packager, and Sealing and Canceling Machine Operator.  Id.

To the extent plaintiff attacks the hypothetical posed by the ALJ to Ms. Wilson, as discussed earlier, there is substantial evidence in the record to support such hypothetical and the assumptions upon which the vocational expert based her opinion.  Thus, the ALJ's adoption of Ms. Wilson's opinion satisfied the Commission's burden of showing the existence of alternative substantial gainful employment suited to plaintiff's physical and vocational capabilities.  See Bapp v.

<u>Bowen</u>, 802 F.2d 601, 605 (2d Cir. 1986); <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1554 (2d Cir. 1983).

      B.     <u>Obligation to Develop the Record</u>

Plaintiff argues that the ALJ failed to develop the record. Specifically, plaintiff argues that the ALJ "failed to make any effort to complete the record by obtaining [plaintiff's] surgical records." Mem. in Supp. at 9. The Court rejects this argument.

Contrary to plaintiff's argument, the ALJ adequately developed the record even though the surgical report relating to plaintiff's left shoulder was never obtained. First, the ALJ properly asked plaintiff's attorney to attempt to obtain the records. <u>See</u> Tr. 606-07. In addition, when plaintiff was unable to obtain the surgical report, the SSA made an additional effort to obtain the report. Tr. 796. Furthermore, the ALJ informed plaintiff of his right to seek a supplemental hearing, cross-examine the author of the report, or submit additional evidence. Tr. 814-15. Plaintiff did not indicate that additional evidence was available or necessary. The ALJ waited thirty days after giving the plaintiff an opportunity to provide additional evidence to issue his decision. Tr. 553-68. "Notwithstanding the ALJ's duty to develop the record, the Commissioner's Regulations explicitly place the burden of supplying all relevant medical evidence on the claimant." <u>De La Cruz v. Colvin</u>, No. 12-CV-3660 SAS, 2014 WL 2998531, at *11 (S.D.N.Y. July 3, 2014) (citing 20 C.F.R. §§ 404.1512, 416.912(c)). In all events, the Commission's regulations further provide that when the evidence is not sufficient to determine whether the claimant is disabled, despite efforts to obtain additional evidence, a

determination will be made on the available evidence.  20 C.F.R. §§ 404.1520b(d), 416.920b(d).  Thus, the ALJ did not fail to develop the record, and the ALJ properly decided plaintiff's case without the surgical report regarding his left shoulder.

IV.    CONCLUSION

For the aforementioned reasons, defendant's motion is GRANTED, and plaintiff's motion is DENIED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 14, 22, and to terminate this action.

SO ORDERED.

Dated:       New York, New York
             October 26, 2016

_____
       KATHERINE B. FORREST
       United States District Judge